DECISION
On December 4, 2001, relator, Taliaferro Enterprises, filed this action seeking a writ of mandamus directing the Industrial Commission of Ohio ("commission") to vacate its order awarding additional compensation to respondent-claimant, Robert E. Mays, based upon an alleged violation of a specific safety requirement ("VSSR").
Pursuant to Civ.R. 53(C) and Loc.R. 12(M), relator's complaint was referred to a magistrate of this court on December 13, 2001. After reviewing the commission's order, the briefs, the stipulated record, and the argument of counsel, the magistrate rendered a decision which includes comprehensive and appropriate findings of fact and conclusions of law. (Attached as Appendix A.) Specifically, the magistrate concluded that this court should grant relator's request for a writ of mandamus and return this matter to the commission as the commission's order is fatally ambiguous. No objection to that decision and recommendation has been filed.
Having now completed our own review, this court concludes that the magistrate properly applied the applicable law to facts before the court. Finding no error in either the magistrate's decision or analysis, pursuant to Civ.R. 53(E)(4)(a), we hereby adopt the magistrate's April 18, 2002 decision as our own, including the findings of fact and conclusions of law rendered therein. Accordingly, this court issues a writ of mandamus ordering the commission to vacate its VSSR order and to issue a new order which is supported by the evidence in the record.
Writ granted.
BRYANT, J., and TYACK, P.J., concur.
 APPENDIX A IN MANDAMUS
Relator in this original action, Taliaferro Enterprises, seeks a writ compelling respondent Industrial Commission of Ohio to vacate its order awarding additional compensation to Robert E. Mays based on a violation of a specific safety requirement ("VSSR"), and to issue a new order based on the evidence in the record.
Findings of Fact:
1. In July 1996, Robert E. Mays ("claimant") began work at Taliaferro Enterprises. He did brazing and welding that involved the use of lead products, resulting in airborne lead in his work area. Apparently two employees performed these tasks, claimant and Doug Kurovsky, but witnesses agreed that claimant performed most of the work involving lead products.
2. The record includes diverse evidence on the question of whether the employer provided protective respiratory equipment and, if so, what type:
(a) Doug Kurovsky stated in an affidavit that he began work in June 1996, shortly before claimant was hired. He stated that the employer provided all employees in the shop with their own personal respirator to wear while soldering. He specified that respirators with replaceable cartridges were always available. He further stated: "I have personal knowledge that Robert Mays was given a respirator by the Company and possessed it the entire time he worked at Taliaferro Enterprises."
(b) In his testimony at the VSSR hearing, Mr. Kurovsky testified that he and claimant had previously been employed at the same company before coming to Taliaferro, and that the prior employer had provided respirators. He explained that, when he came to Taliaferro in June 1996, the company was just starting up. When he asked for a respirator he was told to order it "from the NAPA guy." At the hearing, Mr. Kurovsky was shown a photograph, taken by the Bureau of Workers' Compensation as part of its on-site investigation, showing a half-mask respirator with chambers for inserting filters and cartridges. (Photo 6, stip. at 64.) Mr. Kurovsky testified that Taliaferro provided those respirators for the length of his employment, that the respirators were always there, kept in a tool box. He stated that he personally gave claimant one of those respirators when claimant was hired, and saw him wearing it a few times. Mr. Kurovsky testified that servicing the respirators involved washing the mask after using it and changing the cartridges when necessary.
(c) Mr. Curren, the current safety director for the company, stated that the type of respirator purchased by the employer had a dual system for both particulate matter and toxic vapors, with a replaceable filter for particulates as well as a cartridge to reduce toxicity of vapors. He explained that the respirator was a strap-on, half-mask respirator that did not cover the eyes, and he noted that the employer had a receipt for the purchase of two respirators. Following the hearing, the employer submitted a copy of the sales receipt dated June 13, 1996, which shows a purchase of two respirators with four canisters and ten pre-filters. In addition, the employer submitted a copy of the manufacturer's specifications and recommendations for a "multi-use half-mask respirator" with "Organic Vapor Cartridge" with "N95 Particulate Filter," which the manufacturer stated was approved by NIOSH, the National Institute for Occupational Safety and Health.
(d) The company owner, Mr. Taliaferro, testified that he was a union employee for fifteen years and president of the union for seven years, fighting for workers' safety on the safety committee. He stated that, when he began his own company in 1996, he bought respirators and installed an exhaust system. He stated that the cartridges could be changed to meet the particular need, and that the seller had provided a list.
(e) In an August 2000 affidavit, Scot Schreck, the field salesman with NAPA Auto Parts, stated that he had been selling "respirators with filters" to the employer for the past four years and serviced them when required.
(f) In a December 2000 affidavit, claimant stated that the "only mask" that was provided by the employer was "a paper mask." Claimant stated that there was "no other safety protection provided including a more substantial mask."
(g) On an undated questionnaire, claimant stated as follows in pertinent part:
Types of personnel protective equipment provided and/or worn
Provided Worn
 Eye Protection ___ Yes ___ Yes Hardhat ___ No ___ No Hand protection ___ Yes ___ Yes Other ___________
 RESPIRATORS
1. None
2. Dust mask
3. Air filtering
4. Air supplied
5. Supplied air purifying
What types of respirators are provided?
2 ______
What types of respirator are used?
2 ______
 Are you required to be clean shaven when wearing a respirator? Y (N)
 Does each employee have their own assigned respirator? Y (N)
(h) In contrast, in his testimony during the VSSR hearing, claimant testified upon direct examination as follows:
 Q. Sir, were you provided any respirators when you were employed at Taliaferro?
A. No, I wasn't.
Q. What were you provided?
A. I wasn't provided with anything.
Q. Was there even any dust mask?
A. No.
Q. How long
A. I never had any dust mask.
(i) In a hand-written note, Alfred Thacker stated:
 The times that I was at Taliaferro's Radiator Shop I saw no masks or respiratory equipment in the shop area, not saying they didn't have them, but I didn't see any.
(j) At the VSSR hearing, Bennie Fields testified that he was in the building several times in connection with taking claimant to work and picking him up, and he saw no respirators or masks of any sort.
3. The record includes diverse evidence as to whether there was an exhaust system, and if so, what type of system:
(a) An invoice was issued to the employer on September 2, 1996, for the purchase of a 10,000 CFM [cubic feet per minute] exhaust fan.
(b) Gary Landis provided an affidavit stating that, in September 1996, he installed a 10,000 CFM exhaust fan in the shop, explaining that the system included "remote pickup hoods strategically located at the various work stations where soldering would be performed."
(c) Mr. Taliaferro testified that the exhaust fan was installed in the ceiling in September 1996, but that all the ducts and venting were not completed for a couple of months.
(d) Claimant stated that, for the first year of his employment, there was no ventilation system at all. He stated that, after about a year, in the summer of 1997, a huge fan was installed in the ceiling, mounted on the roof, but that there were no moveable hoods at the work stations. He stated that the exhaust fan was positioned behind and above him, so that the fumes were pulled up toward his face as they were being pulled out of the shop. When shown pictures of the exhaust system, he testified that he had never seen it except for a fan mounted on the roof. In addition, claimant stated that the exhaust fan was so powerful that it would pull out the warm air during the winter and would, therefore, be turned off.
(e) There was evidence that the workers in the shop did not know how to move the hoods so that the suction would pull fumes away from the work station, and that they learned about adjusting the hoods during the visit by the BWC hygienist.
4. In 1997, claimant began experiencing symptoms of lead poisoning. On February 16, 1998, he was found to have high levels of lead in his blood, and was told to cease his exposure. He withdrew from his employment at Taliaferro and filed a workers' compensation claim.
5. On March 26, 1998, an OSHA inspection was performed, resulting in citation for failure to secure heavy cylinders that could fall over, failure to maintain a log of occupational injuries and illnesses, failure to have emergency plans for fires and other emergencies, failure to have a written hazard-communication program including a list of hazardous chemicals on site, failure to train employees regarding hazardous chemicals, and failure to provide OSHA information regarding hazards.
6. According to counsel for claimant during the VSSR hearing, OSHA investigators made notations and comments about protective gear for employees. However, those documents do not appear to be in the record before this court.
7. At the employer's request, an industrial hygienist from the Bureau of Workers' Compensation visited the company on March 20, 1998. The hygienist monitored the air for lead, including the use of individual monitors for eight hours on the two employees in the shop. Both workers reported that the work activity reflected a normal work day. The hygienist noted that there were moveable intake hoods for the ventilation system, but observed that the hood was placed more than one duct length away from the operation being performed. Although the inspector found that the occupational exposure limit for lead was not exceeded in any of the areas he tested, he stated that the hood must be located as close as possible to the operation. The inspector further recommended that workers should be trained to place the hood to within one duct length of the source of contamination. He also recommended that workers should refrain from eating, drinking, or smoking while working with lead-containing products, and should wash their hands before eating or smoking, in order to prevent ingesting lead particles orally.
8. On March 31, 1998, OSHA took air samples and detected no overexposure. The limit of permissible exposure was .050 ppm and the actual level was .015 ppm.
9. The workers' compensation claim was allowed for the toxic effect of lead, including respiratory conditions, caused by exposure to lead compounds and fumes.
10. In February 2000, claimant filed a VSSR application, stating that he sustained occupational injury due to the employer's violation of Ohio Adm. Code 4121:1-5-17(F)(1).
11. The Bureau of Workers' Compensation investigated the VSSR claim and provided a report in May 2000 regarding whether the claimant's illness was caused by a VSSR, including the affidavits described above as well as photographs of the work site, exhaust system, and respirator with cartridge and filter.
12. In March 2001, a hearing was held before a staff hearing officer, who ruled as follows:
 * * * [T]he claimant's injury was the result of employer's failure to comply with the Code of Specific Requirements of the Industrial Commission.
 After reviewing all the evidence on file purchase documents, OHSHA [sic] reports, safety investigation and considering the testimony of Mr. Mays and Mr. Taliaferro, it is the order of the Staff Hearing Officer that the claimant's application filed on 02/04/2000 for violation of a specific safety requirement is granted for the reason set forth in this order.
 On July 1, 1996 the claimant was hired by the employer to repair and rebuild radiators. His specific job required him to solder and weld radiators using lead flukes. In June 1997 the claimant had symptoms of lead poisoning but the condition was not diagnosed until February 16, 1998. Dr. Marcel J. Casavant, M.D., noted on 03/17/1998 that the claimant had chronic exposure to lead and that his blood lead level was dangerously high. His treating physician took the claimant off work.
 The Federal Occupational Safety and Health received notice of hazards at the claimant's workplace and performed an on site investigation. O.S.H.A. found that the employer failed to provide hazard communication training to its employees who were subjected to hazardous chemical/products, that the employer failed to inform employees in the radiator repair, where there is a potential exposure to airborne lead, were not informed of the regulations concerning airborne lead particles.
 Evidence on file shows that the employer had purchased two respirator devices and had installed an exhaust system.
 On February 4, 2000, the claimant filed an application for Violation of a Specific Safety Requirement in which he alleged that the employer violated Ohio Administrative Code 4121:1-5-17(F)(1).
 The code section that the claimant cited provides as follows:
Respiratory protection
 (1) Where there are air contaminants as defined in rule 4121:1-5-01 of the Administrative Code, the employer shall provide respiratory equipment approved for the hazard. It shall be the responsibility of the employee to use the respirator or respiratory equipment provided by the employer, guard it against damage and report any malfunction to the employer. [sic]
 (2) This requirement does not apply where an effective exhaust system (see rules 4121:1-5-18 and 4121:5-992 of the Administrative Code) or where other means of equal or greater protection have been provided.
 It is the order of the Staff Hearing Officer that the employer violated 4121:1-5-17(F)(1) by failing to provide respiratory equipment approved for the hazard. The Staff Hearing Officer finds that the employer had purchased respiratory equipment and provided it to the claimant. The Staff Hearing Officer finds that the claimant's first declaration by way of a questionnaire in the claim file to be the most accurate that the employer provided a respiratory device and he used such a device. However, the employer failed to purchase a respiratory "device, which provides respiratory protection against particulate matter, such as non volatile dust, mists or metal fumes" as specified by O.A.C. 4121:1-5-01(B)(110). The Medical evidence on file establishes without a doubt that the claimant developed dangerous high level of lead in his blood, that the only reasonably contact that the claimant would have been exposed to lead was at his place of employment. The Staff Hearing Officer finds that the employer's failure to purchase a respirator equipped for the hazard is the proximate cause of the claimant's industrial injury. [Emphasis added.]
 The Staff Hearing Officer notes that both the employer and the claimant presented testimony concerning whether the exhaust system installed by the employer pulled the fumes away from the claimant. The Staff Hearing Officer assumes that the employer raised this issue to present evidence that not only did the employer provide a respirator but also provided extra protection against lead poisoning by installing an exhaust system.
 O.A.C. 4121:1-5-17(F)(2) states that an employer does not have to provide a respirator where an effective exhaust system has been provided.
 Evidence on file shows that the employer had installed an exhaust system and evidence also shows that the employee did not have proper knowledge of how to use the system. A safety investigator had to show the employee where to locate the suction in order to draw the fumes away.
 The Staff Hearing Officer finds that the exhaust system in place at the time of the exposure was not an effective exhaust system because the employer was not using the exhaust system properly and, therefore, the claimant was exposed to lead particles. It is noted that a safety investigator had to show the employer how to use the equipment properly.
 It is therefore ordered that an additional award of compensation be granted to the claimant * * *.
13. Rehearing was denied.
Conclusions of Law:
In the present action, it is not disputed that the claimant was exposed to lead while working and sustained an occupational illness. There is no dispute that he is entitled to workers' compensation benefits in connection with that exposure and illness. The question before the commission was whether the occupational illness was caused by the employer's failure to comply with a specific safety requirement, and the question before the court is whether the commission abused its discretion in finding a violation.
The applicable law is set forth in numerous judicial decisions, including State ex rel. Trydle v. Indus. Comm. (1972), 32 Ohio St.2d 257; State ex rel. Buehler Food Markets, Inc. v. Indus. Comm. (1980),64 Ohio St.2d 16; State ex rel. Cincinnati Drum Service, Inc. v. Indus. Comm. (1990), 52 Ohio St.3d 135; State ex rel. Cotterman v. St. Marys Foundry (1989), 46 Ohio St.3d 42; State ex rel. Frank Brown Sons, Inc. v. Indus. Comm. (1988), 37 Ohio St.3d 162; and State ex rel. Watson v. Indus. Comm. (1986), 29 Ohio App.3d 354. In brief, the claimant has the burden of establishing that the specific safety requirement was applicable, that it was violated, and that the violation was the cause of the occupational illness or injury. State ex rel. Commercial Lovelace Motor Freight, Inc. v. Lancaster (1986), 22 Ohio St.3d 191, 193. Because a VSSR award is a penalty against the employer, the specific safety requirement must be construed in favor of the employer. State ex rel. Burton v. Indus. Comm. (1989), 46 Ohio St.3d 170.
In the subject order, the commission found a violation of Ohio Adm. Code4121:1-5-17(F)(1), which provides as follows:
 (1) Where there are air contaminants as defined in rule 4121:1-5-01 of the Administrative Code, the employer shall provide respiratory equipment approved for the hazard. It shall be the responsibility of the employee to use the respirator or respiratory equipment provided by the employer, guard it against damage and report any malfunction to the employer. Note: see appendix to this rule for basic guides for the selection of respirators.
In the present action, the employer acknowledges that it was required to comply with Ohio Adm. Code 4121:1-5-17(F)(1). The employer contends, however, that it complied with that section's requirement to "provide respiratory equipment approved for the hazard." The employer argues that, although the commission was correct in concluding that the employer purchased and provided the two dual-function respirators, the commission had no evidence to support its conclusion that these respirators were not "approved for the hazard."
In the record, the evidence is widely divergent as to the respiratory equipment provided to claimant. Claimant wrote on a questionnaire that he was given a dust mask and he also stated in his affidavit that he was given a paper mask. However, at the hearing, claimant asserted that he was given no mask of any kind, not even a dust mask. In contrast, Mr. Kurovsky (an employee), Mr. Taliaferro (the employer), and Mr. Schreck (the salesman) all swore that the company purchased respirators with removable cartridges and filters. Also, documentary evidence indicated that the employer purchased a dual-function respirator with a mechanical filter for dust particles as well as a chemical cartridge to reduce toxicity of vapors and gases.
The commission had discretion to determine which evidence it found more convincing. State ex rel. Pass v. C.S.T. Extraction Co. (1996),74 Ohio St.3d 373. In the record, there is "some evidence" to support a variety of findings: that the employer provided the two respirators it described, that the employer provided only dust masks or paper masks, or that it provided no mask of any kind.
The order, however, is fatally unclear. The commission did not state whether the employer purchased the respirators with cartridges or provided paper masks. Further, if the commission found that the employer provided the two respirators with cartridges (as the order suggests), then it is unclear on what evidence the commission relied in finding that these respirators were not "approved."
In its order, the commission stated: "Evidence on file shows that the employer had purchased two respirator devices." The commission also found that the employer "purchased respiratory equipment and provided it to the claimant." The only evidence of purchases, however, was in regard to the purchase of respirators with cartridges and filters. Thus, the commission appeared to accept that the employer did in fact purchase and provide the two dual-function respirators it claimed, as pictured in the photograph. However, the commission subsequently stated a contrary finding, that it found "claimant's first declaration by way of a questionnaire * * * to be the most accurate that the employer provided a respiratory device." The questionnaire indicates that the employer did not provide dual-function respirators as it claimed but provided only dust masks.
These contradictory findings make the order fatally ambiguous On one hand, the order can be read as concluding that the employer provided two respirators of the dual-function type. On the other hand, the order can be read as concluding that the employer purchased only dust masks. Accordingly, a limited writ is necessary to return this matter to the commission because the commission failed to provide an explanation that is adequate to permit judicial review, in stating contradictory or at least ambiguous findings on a crucial issue, State ex rel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203.
Next, depending on which type of respiratory device was provided, the commission was obliged to consider whether that type of respirator was "approved for the hazard." In the subject order, the commission apparently inferred that the respirator was "not approved" because an injury occurred. That is, the only evidence of non-approval was apparently the fact that claimant experienced lead poisoning.
For purposes of the remand to the commission, the magistrate notes that the specific safety rule at issue in regard to respiratory equipment, Ohio Adm. Code 4121:1-5-17(F)(1), requires only that the respirator or respiratory equipment be "approved" for the hazard. Unlike the alternative provision in division (F)(2), which requires that an exhaust system be "effective," the provision in division (F)(1) does not require that the respirator or respiratory equipment be "effective." Pursuant to this distinction, testing the air for pollutants would determine whether an exhaust system is "effective," but the criterion for personal respirators is whether they are "approved."
The definitions at Ohio Adm. Code 4121:1-5-01(B) describe the following categories of respiratory devices:
(110) "Respiratory devices":
 (a) "Air-purifying device": a device which removes contaminants from the atmosphere and used only in atmospheres containing sufficient oxygen to sustain life (at least 19.5 per cent by volume at sea level) and within specified concentration limitations to the specific device. These are:
 (i) "Mechanical-filter respirator": a device which provides respiratory protection against particulate matter, such as nonvolatile dust, mists or metal fumes.
 (ii) "Chemical-cartridge respirator": a device which provides respiratory protection against certain specific gases and vapors in concentrations not in excess of 0.1 per cent by volume.
 (iii). "Gas mask": a device which provides respiratory protection against certain specific gases and vapors in concentrations no greater than that specified on the canister label.
 (b) "Supplied-air device": a device, other than self-contained breathing apparatus, which delivers breathing air for an indefinite period of time through a supply hose connected to the wearer's facepiece.
 (c) "Self-contained breathing apparatus": a device which provides complete breathing protection for a limited period of time based on the amount of breathing air or ists equivalent supplied and the breathing demand of the wearer.
This section, however, does not address what type of respiratory device should be used in particular environments.
Ohio Adm. Code 4121:1-5-17(F)(1) directs attention to an appendix that provides "basic guides for the selection of respirators." This appendix, titled "Respirator Selection Guide," indicates that, where there is a danger of both particulate and gaseous contamination, the choice of respirator depends on whether the contaminants are "immediately dangerous" to life/health or not "immediately dangerous." The guide states that, when the contaminants are toxic but not immediately dangerous to life, the proper respirators include: (1) an air-line respirator; (2) a hose mask without blower; or (3) an air-purifying, half-mask or mouthpiece respirator with chemical cartridge and appropriate filter.
On remand, the commission must address the applicability of the guide. If the guide provides standards for when a respirator is "approved," the commission must then address the question of whether soldering with a lead-based material is "immediately" dangerous to life or causes dangerous poisoning over time. In addition, the commission must determine if the respiratory devices provided by Taliaferro were approved for environments involving the hazard of airborne lead.
On remand, the focus must remain on the specific language of the safety requirement at issue. Construing the safety requirement strictly (as required due to the punitive nature of a VSSR award), the commission can find a violation only if the claimant has proved that the respirator provided by the employer was not "approved" for the hazard.
In summary, the magistrate recommends a limited writ returning this matter to the commission to vacate its VSSR decision and to give further consideration to the VSSR application filed by claimant, issuing a new order that grants or denies the application according to the applicable law and the evidence in the record.